**McCOMB, Adm'r, Wage and Hour Div., U. S. Dept. of Labor, v. NEW YORK & NEW BRUNSWICK AUTO EXP. CO., Inc.**

**Civ. No. 837–49.**

United States District Court
D. New Jersey.
April 12, 1950.

Joseph D. Breitbart, Senior Attorney, and Henry J. Easton, Associate Attorney, U. S. Dept. of Labor, New York City, William S. Tyson, Solicitor, and John J. Babe, Assistant Solicitor, U. S. Dept. of Labor, Washington, D. C., and John A. Hughes, Regional Atty., U. S. Dept. of Labor, New York City, for plaintiff.

Morris Spritzer, New Brunswick, N. J., for defendant.

FORMAN, District Judge.

The plaintiff, Administrator of the Wage and Hour Division of the United States Department of Labor, filed his complaint against the defendant, the New York & New Brunswick Auto Express Co., Inc., in which it is alleged that the defendant has violated and is violating the provisions of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq. by employing certain of its employees in interstate commerce for workweeks longer than 40 hours since May 1, 1942 without compensating these employees for their employment in excess of 40 hours in workweeks at rates not less than one and one-half times the regular rates at which they were employed.

The plaintiff seeks a judgment enjoining and restraining the violations of which he complains pursuant to § 17 of the Act, 29 U.S.C.A. § 217.[1]

At the trial the proofs developed that the complaint revolved around seven employees of the defendant:

1. Frank Mannino
2. Michael Cserveynak
3. David Dodds
4. John Steiner
5. Jacob Lowen
6. Herbert Kerr
7. Wilbur Surasky

1. "The district courts of the United States and the United States courts of the Territories and possessions shall have jurisdiction, for cause shown, and subject to the provisions of section 20 (relating to notice to opposite party) of the Act entitled 'An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes', approved October 15, 1914, as amended (U.S.C. 1934 edition, Title 28, sec. 381), to restrain violations of section 215 of this title."

The facts demonstrate that the defendant is a motor transportation company with its principal office and place of business in New Brunswick, New Jersey, and terminal facilities in New York, Philadelphia, Baltimore and Lancaster. In its entire system it employs roughly over two hundred workers, the large majority of whom are occupied in New Brunswick, in its main plant. It is a closed corporation owned by two families. Fathers and a son of each are the executive heads of the business.

It is agreed that the defendant is licensed to operate in interstate commerce and that the employees who are the subject of the complaint, it is conceded by the defendant, have worked more than forty hours in a workweek without receiving time and half time for such hours as they have worked in excess of forty hours in a workweek.

The defendant took the position that the employees concerning whom the plaintiff complains are exempt from the operations of the Act, as being, (1) exclusively subject to the jurisdiction of the Interstate Commerce Commission, or (2) administrative employees. These exceptions to the operation of the Act are claimed by the defendant to be authorized under § 13(a) (1) and 13(b) (1) of the Act, 29 U.S.C.A. § 213(a) (1) and (b) (1).[2]

In the instances of Mannino and Cserveynak, the employees were engaged in manual work having to do with the equipment of the defendant. The defendant claims with regard to both of these employees that they are not covered by the Act but are under the jurisdiction of the Interstate Commerce Commission with regard to hours, and the source of the authority for their exemption is § 13(b) (1) of the Act.

### 1. Frank Mannino.

Specifically, in the case of Frank Mannino, it appeared from the proofs that he is chiefly engaged in filling motor vehicles of the defendant with gas, oil and water. This occupies his attention on each of the five nights of the week he works. He also goes into the plant on Saturday but only a few of the vehicles require gas and oil on that day. He occupies himself then in driving tractors from their places in the parking yard to the inspection station and in returning them to the parking yard. It is also his duty as he performs the service of supplying gas, oil and water to the vehicles to observe if any lugs which hold the wheels of the vehicles in place are loose or otherwise imperfectly in position. If he finds such condition, it is duty to tighten the lugs if he can, and if not the matter is to be brought by him to the attention of the mechanic.

The defendant contended that in the matter of ascertaining the necessity for filling radiators of the motor vehicles with water and in the area of moving the vehicles to and from the inspection station as well as in so far as his duties concerned the security of the lugs on the wheels of the motor vehicles, this employee was engaged in the safety of operation of the vehicle, which brought him under the coverage of the Interstate Commerce Commission regulations and withdrew him from the provisions of the Fair Labor Standards Act.

The services with regard to water are in no different category with regard to the safety of the operation of the vehicle than in providing it with gas and oil. The latter operations have been held not to constitute services closely enough connected with safety of operation as to give the employer immunity from the Act.[3] The driving of

---

2. 29 U.S.C.A. § 213:
   "(a) The provisions of sections 206 and 207 of this title shall not apply with respect to (1) any employee employed in a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman (as such terms are defined and delimited by regulations of the Administrator);
   * * *
   "(b) The provisions of section 207 of

this title shall not apply with respect to (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49;"

3. Ex parte No. MC–2, 28 M.C.C. 125, 132, 133. See Morris v. McComb, 332 U.S. 422, 429, note 8, 68 S.Ct. 131, 92 L.Ed. 44.

the trucks to the inspection station and the return thereof to the parking yard likewise is not such an operation.

In argument the defendant placed its reliance chiefly upon the duties concerned with the lugs. The employee testified that in his execution of this duty he observed the lugs as he passed about each vehicle in his operation of servicing it with gas, oil and water. Neither can the service that · the employee rendered in connection with the lugs be regarded as so closely associated with the safety of operation of the vehicle as to give the defendant the relief it suggests. The duty cast upon this employee in this respect was purely an observational one and a kind of extra check in this direction as he performed other duties as enumerated. The occasional discovery by him of a loose lug and the tightening thereof cannot be regarded as of sufficient substance to place him outside of the provisions of the Act since this operation was insignificant in his routine of other work. Moreover, the defendant admittedly employed other means for the safety in operation of their vehicles with regard to tires. The lugs are an integral part of the wheel on which the tires are mounted, and facilities for the safe maintenance of this acutely hazardous portion of the vehicle were otherwise maintained than by the casual observations performed by this employee. The defense failed in this instance.

### 2. Michael Cserveynak.

Taking up the allegations concerning the employee, Michael Cserveynak, he testified that he was employed by the defendant for a number of years as a carpenter, working in its blacksmith shop; that for a year or a year and a half prior to the hearing, his duties had changed considerably and during that time he was engaged practically entirely in doing wood work, as, for example, in replacing wholly or in part the flooring and bodies of the trailers; he performed work in connection with the fifth wheel of the tractors to the extent that he installed the wooden block upon which the fifth wheel was supported. He testified that he did other carpentry work about the plant, such as the building and repair of the platform. He also testi-

fied that he did repair work on the bodies of trailers to the extent of installing metal panels in their sides but did no metal work whatsoever otherwise. He was at times engaged as helper to the mechanics in the blacksmith shop but this extended only in so far as assistance in lifting heavy objects or handing to them their tools.

He was apparently a little confused on the stand and spoke in broken English. The plaintiff's counsel who had previously interviewed him was surprised by some of his testimony and considerable latitude was permitted in his direct examination.

Later in the trial the defense produced as a witness his immediate superior, John Stropko, a kind of foreman mechanic. This witness testified that the duties performed by the employee involving wood work and carpentry work occupied approximately only ten hours a week and that the employee actually was a mechanics' helper, in the sense that he did much more than only hand tools to the mechanics and to assist with the lifting of objects. The witness testified that the employee engaged in metal work in association with portions of the vehicles intrinsically involved in safety of operation such as the fifth wheel, that the employee made brackets, used an acetylene torch as well as the witness, and, generally, was the active helper in the matter of the adjustment of bolts where two men were required to be under the trailer to install them, and other similar operation.

If the witness is to be believed, he gave a completely different program of work than did the employee. It is true that the witness was in the nature of a foreman and had worked for the defendant for many years and could thereby be held to be deeply interested in his employer. However, his demeanor on the stand, his opportunity for observation and recollection all were persuasive that he was telling the truth. They were in contrast to the demeanor of the employee as he testified. Taking into account the association of the witness with the defendant in the area of interest, he was still persuasive. Under these circumstances, the employee is and was engaged during the period in question in such work as would place him within the cate-

gory of workers under the jurisdiction of the Interstate Commerce Commission and the defendant was justified in considering him exempt under § 13(b) (1) of the Fair Labor Standards Act.

3. David Dodds
4. John Steiner
5. Jacob Lowen

The next three employees, David Dodds, John Steiner and Jacob Lowen, were generally known as dispatchers, although they at times called themselves supervisors. In turn, they worked in shifts around the clock.

In the case of David Dodds, it was shown that he reported for work at 5 p. m. and worked until about 2 or 3 a. m. He regarded himself as the night supervisor. He testified that when he arrived at work he informed himself by telephone from the other points in the defendant's system as to the state of the vehicles in transit regarding their number and loads. He testified that it was difficult to explain the detail of operation that he performed because the work had to be done rather by instinct and from experience than according to any laid out rules. He also conferred with the dispatcher or supervisor who was going off duty as he came on and learned the state of the operation as it was at that time. He got from various sources, namely, the manifests, direct observation on the platform and from the waybills, the knowledge of the destinations and nature of the cargoes on the trailers, and it was his duty to see that the appropriate number of trailers, drivers and placement of cargoes were so employed as to conduct the transportation business as economically and efficiently as possible.

Under his direct orders were the platform foremen, assistant foremen and twenty-four platform loaders. In addition to these, he also had under his orders the workers in the mechanical force. During the night hours that he was employed he was completely in charge of the operation phase of the defendant's business, subject to the orders of no one unless in the event of the occasional night presence of one of the owner executives of the business. He

had complete authority and discretion to delay delivery of cargoes, using his knowledge of the customers' wants and necessities in this connection. He hired and discharged employees, although it was conceded that hiring employees during the hours in which he worked was an infrequent procedure. He spent approximately two hours of his tour of duty in matching up waybills to manifests which would be placed in the hands of the drivers.

He testified to the effect that this procedure had a two-fold objective: (1) it gave him definitive knowledge of the proper lading of each trailer, and, (2) it placed the waybills in appropriate order for the handling of the material with regard to the delivery points by the driver of the equipment. This was done sporadically during the course of the entire night hours of the witness, and his estimate of two hours was upon the basis of his compressing the operations as if he were doing them continuously. His pay was at the rate of $88 per week.

Each night at the expiration of his tour of duty he was followed by John Steiner, who testified that he performed similar duties to Mr. Dodds'. His hours were generally from midnight until 9 a. m. While Mr. Dodds was concerned chiefly with the trend of traffic to the south of New Brunswick, by the time that Mr. Steiner came on, this was generally in operation and under way and his concern was chiefly with the shipments destined to points in New Jersey. He had the same supervisory functions and received $103 a week for his work.

When Mr. Steiner was ready to leave he was succeeded by Jacob Lowen, who was on duty from 9 a. m. to 6 p. m. During this daytime shift the freight was actually in transit and the employees otherwise engaged in large number in loading and unloading were not present on the platform, but as the witness expressed it, his job was to see that everything ran right except the clerical department. Much of his time was given over to answering the telephonic complaints and questions of customers and defendant's personnel on the road. The witness estimated that sixty percent of

the telephone conversations were with customers and forty percent with employees. He received $103 per week for his services.

All three of these employees have been engaged with the defendant for long years and have come up through the various laboring ranks to their positions. They were the controllers of the heart mechanism of the business of the defendant. Their responsibilities went to the defendant, its customers and the other employees. Together they form the round-the-clock team that administers the actual commodity that it sells, namely, the collection and delivery of merchandise.

The term "bona fide * * * administrative" has been defined as follows by the plaintiff:

"Section 541.2 of the regulations defines the term 'bona fide * * * administrative' as follows:

"The term 'employee in a bona fide * * administrative * * * capacity' in section 12 (a) (1) of the act shall mean any employee—

"(a) whose primary duty consists of the performance of office or nonmanual field work directly related to management policies or general business operations of his employer or his employer's customers; and

"(b) who customarily and regularly exercises discretion and independent judgment; and

"(c) (1) who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined in these regulations), or

"(2) who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge, or

"(3) who executes under only general supervision special assignments and tasks; and

"(d) who does not devote more than 20 percent of his hours worked in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (c) of this section; and

"(e) who is compensated for his services on a salary or fee basis at a rate of not less than $75 per week (or $200 per month if employed in Puerto Rico or the Virgin Islands) exclusive of board, lodging, or other facilities;

"Provided, That an employee who is compensated on a salary or fee basis at a rate of not less than $100 per week (exclusive of board, lodging or other facilities), and whose primary duty consists of the performance of office or nonmanual field work directly related to management policies or general business operations of his employer or his employer's customers, which includes work requiring the exercise of discretion and independent judgment, shall be deemed to meet all of the requirements of this section." Explanatory Bulletin-Regulations Part 541, United States Department of Labor, Wage and Hour and Public Contracts Division, Effective January 25, 1950.

As gleaned from the testimony given to the court on examination and cross examination, the work performed by these employees fitted into the above terms as though it were machine-tooled for the purpose. They performed non-manual field work directly related to the general business operations of their employer or their employer's customers; they customarily and regularly exercised discretion and independent judgment; they regularly and directly assisted the proprietor in an administrative capacity as such terms are defined in the regulations; they do not devote more than twenty percent of the hours worked in the workweek to activities which are not directly and closely related to the performance of work in the general business operations of their employer and in bona fide administrative capacities regularly and directly assisting the proprietor; they are compensated for their services on a salary basis more than $75 per week; and two of them receive a salary of more that $100 per week, and in such cases their primary duty consisted of the performance of office or non-manual field work directly related to general business operations of their employer or their employer's customers, which includes work requiring the exercise of

discretion and independent judgment. These employees, Messrs. Dodds, Steiner and Lowen, are justifiably regarded by the defendant as exempt under § 13(a) (1) of the Fair Labor Standards Act.

6. Herbert Kerr
7. Wilbur Surasky

■ The last category of employees to be considered comprises Herbert Kerr and Wilbur Surasky. In the case of Mr. Kerr, he has a number of clerks under his control and he devotes by far the greater amount of his time during the hours from 6:30 p. m. until 2:30 to 3:30 a. m. in the matter of ascertaining classifications or ratings of shipments and computing rates. He averages 700 such computations in the course of each night's work. He estimated that he could set down the rating and rate of 650 of the shipments but that 50 of them would require research with regard to classification and rate. For this information he would turn to various compendia of information containing classifications, tariffs, et cetera. At times when he had ascertained the necessary information he made the extensions thereof as the shipment information indicated on a copy of the waybill. At other times the extensions were done by clerks who functioned under his command. He received a salary of $95 per week.

A consideration of the same regulations involved in the cases of Messrs. Dodds, Steiner and Lowen, the so-called dispatchers, leads to the opposite result in his case. Although he undoubtedly had areas of work requiring administrative capacity in the personnel field with his authority over six clerks who worked with him, whose duties were supplementary to his own, including the receipt and checking of cash income, they cannot be said to be in the administrative field with regard to the general operations of the defendant contemplated by the regulations.

The essence of his work required him to exercise no substantial discretion but simply, efficiently and accurately to ferret out of the information provided for him in the way of source data that formed the basis for the charges made by the defendant for its work. This required a consider-

able degree of skill and proficiency but does not fall into the sphere of administrative capacity which takes him out of the purview of the Fair Labor Standards Act.

■ His colleague, Mr. Surasky, worked during the daytime from 8:30 a. m. to 5:30 p. m. generally, although he frequently was at work as early as seven o'clock in the morning, and also at times worked on Saturday. His pay amounted to $91 a week, and if, as and when he was paid overtime it was at straight time pay. His chief task was to check and audit the computations made by Mr. Kerr and other similar computations made by other employees in the defendant's system so that each day he audited between 1100 and 1200 items of billing. He also was the superior of a clerk who supplemented his calculations. The traffic manager of the defendant frequently consulted him for technical information, and to that extent it appears that the defendant regarded him as assistant to the traffic manager. The great volume of his work, however, was the necessary auditing of the computations made by others and the processing of corrections of errors. His work was productive of a mass of corrections, averaging, in estimate fifteen percent of the total billings examined by him. Again, his work necessitated efficient and accurate computational manipulations but not of a nature fraught with the exercise of discretion in the performance of duties going directly to the general business operations of his employer as to give him the administrative status of an employee outside of the Fair Labor Standards Act. The defendant is not justified in regarding either Mr. Kerr or Mr. Surasky as coming within the exemption provided for in § 13(a) (1) of the Fair Labor Standards Act.

The foregoing shall constitute Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A.

Plaintiff is entitled to a judgment enjoining the violations as found herein, as authorized by § 17 of the Fair Labor Standards Act.

The parties should agree on the form of decree or it should be noticed by the plaintiff for settlement on a motion day.